**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| NEUSTAR, INC., JAMES G. CULLEN, PAUL D. BALLEW, JOEL P. FRIEDMAN, MARK N. GREENE,  LISA A. HOOK, ROSS K. IRELAND, PAUL A. LACOUTURE, DEBORAH D. RIEMAN, MICHAEL J. ROWNY, HELLENE S. RUNTAGH , GOLDEN GATE CAPITAL, GIC, AERIAL TOPCO, L.P., and AERIAL MERGER SUB, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) | |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action stems from a proposed transaction announced on December 14, 2016 (the "Proposed Transaction"), pursuant to which Neustar, Inc. ("Neustar" or the "Company") will be acquired by a private investment group led by Golden Gate Capital.

2.      On December 14, 2016, Neustar's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Aerial Topco, L.P. ("Parent") and Aerial Merger Sub, Inc. ("Merger Sub," and together with Parent, Golden Gate Capital, and GIC, "Golden Gate").  Pursuant to the terms of

the Merger Agreement, shareholders of Neustar will receive $33.50 per share in cash.   An affiliate of GIC will also invest in Neustar and become a minority owner of the Company following the close of the transaction.

3.        On January 17, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.        The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.   Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.        This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.        This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.        Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.        Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Neustar common stock.

9.      Defendant Neustar is a Delaware corporation and maintains its principal executive office at 21575 Ridgetop Circle, Sterling, Virginia 20166.  Neustar's common stock is traded on the NYSE under the ticker symbol "NSR."

10.     Defendant James G. Cullen ("Cullen") has served as a director of Neustar since 2005 and as Chairman of the Board since 2010.  According to the Company's website, Cullen is Chair of the Finance Committee and a member of the Compensation Committee.

11.     Defendant Paul D. Ballew ("Ballew") has served as a director of Neustar since July 2015.  According to the Company's website, Ballew is a member of the Audit Committee.

12.     Defendant Joel P. Friedman ("Friedman") has served as a director of Neustar since 2006.  According to the Company's website, Friedman is a member of the Audit Committee and the Finance Committee.

13.     Defendant Mark N. Greene ("Greene") has served as a director of Neustar since April 2012.  According to the Company's website, Greene is a member of the Compensation Committee and the Neutrality Committee.

14.     Defendant Lisa A. Hook ("Hook") has served as a director of Neustar since November 2010, as Chief Executive Officer ("CEO") since October 2010, and as President since January 2008.   According to the Company's website, Hook is a member of the Neutrality Committee.

15.     Defendant Ross K. Ireland ("Ireland") has served as a director of Neustar since 2006.  According to the Company's website, Ireland is Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

16.     Defendant Paul A. Lacouture ("Lacouture") has served as a director of Neustar since 2007.   According to the Company's website, Lacouture is Chair of the Compensation

Committee and a member of the Nominating and Corporate Governance Committee.

17.     Defendant Deborah D. Rieman ("Rieman") has served as a director of Neustar since July 2015.  According to the Company's website, Rieman is Chair of the Neutrality Committee and a member of the Compensation Committee.

18.     Defendant Michael J. Rowny ("Rowny") has served as a director of Neustar since 2006.  According to the Company's website, Rowny is Chair of the Audit Committee, a member of the Nominating and Corporate Governance Committee, and a member of the Finance Committee.

19.     Defendant Hellene S. Runtagh ("Runtagh") has served as a director of Neustar since 2006.  According to the Company's website, Runtagh is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

20.     The defendants identified in paragraphs 10 through 19 are collectively referred to herein as the "Individual Defendants."

21.     Defendant Golden Gate Capital is a San Francisco-based private equity investment firm with over $15 billion of capital under management.

22.     Defendant Parent is a Delaware limited partnership and a party to the Merger Agreement.

23.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

24.     Defendant GIC is a global investment firm established in 1981 to manage Singapore's foreign reserves.

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Neustar (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

26.    This action is properly maintainable as a class action.

27.    The Class is so numerous that joinder of all members is impracticable.  As of December 12, 2016, there were approximately 54,757,172 shares of Neustar Class A common stock outstanding and 1,864 shares of Class B common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

28.    Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

29.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

30.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to

protect their interests.

31.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

32.     Neustar offers authoritative, hard-to-replicate data sets and proprietary analytics that provide insights to help clients promote and protect their businesses.  The Company's proprietary, cloud-based platforms and differentiated data sets offer informative, real-time analytics, which enable clients to make actionable, data-driven decisions.

33.     The Company provides chief marketing officers a comprehensive suite of services to plan their media spend, identify and locate desired customers, invest effectively in marketing campaigns, deliver relevant offers, and measure the performance of these activities. Additionally, security professionals use the Company's solutions to maximize web performance and protect against malicious attacks.

34.     On April 28, 2016, Neustar issued a press release wherein it reported its financial results for the first quarter ended March 31, 2016.  The Company reported that revenue increased 14% to $287.3 million, Marketing Services revenue increased 55% to $57.7 million, and Security Services revenue increased 23% to $48.6 million.  With respect to the results, Individual Defendant Hook, Neustar's President and CEO, commented:

> Once again, our Information Services delivered strong organic revenue growth, led by 25% in Marketing Services and 10% in Security Services. And after owning MarketShare for a full quarter, we are even more confident in the strategic fit of this acquisition[.] It is clear that the combination of our teams, powerful analytics and unique authoritative identity framework positions us favorably to capitalize on tremendous opportunities and drive shareholder value. The power

of the combination is demonstrated by recent customer wins such as Audi UK, Deutsche Telecom and Angie's List. Long-term prospects remain strong[.]

35.     On July 28, 2016, Neustar issued a press release wherein it reported its financial results for the second quarter ended June 30, 2016.   The Company reported that revenue increased 16% to $297.6 million, Marketing Services revenue increased 56% to $63.9 million, and Security Services revenue increased 22% to $49.3 million.   Adjusted EBITDA increased 12% to $131.4 million, a margin of 44%, and adjusted net income increased 12% to $69.4 million or $1.26 per share.   With respect to the results, Individual Defendant Hook commented:

> During the second quarter, we delivered strong financial results and improved our growth prospects in attractive markets by entering into key strategic partnerships with companies that include Limelight Networks and Experian. Through these partnerships, we have created the world's largest and most distributed DDoS mitigation network, and we have established a best-in-class marketing solution to target and deliver audience data in an omni-channel environment[.]   We are focused on expanding our differentiated position in these markets, and delivering on our 2016 objectives.

36.     On October 27, 2016, Neustar issued a press release wherein it reported its financial results for the third quarter ended September 30, 2016.   The Company reported that revenue increased 15% to $300.1 million, Marketing Services revenue increased 54% to $63.3 million, and Security Services revenue increased 18% to $51.0 million.   Net income increased 5% to $53.0 million or $0.96 per share.   Adjusted EBITDA increased 6% to $134.5 million, a margin of 45%.   Moreover, adjusted net income increased 67% to $121.0 million or $2.18 per share.   With respect to the results, Individual Defendant Hook commented:

> Over the past several years we have made significant progress in transforming Neustar, having built market-leading solutions to serve rapidly-growing markets. We are receiving external validation of the quality of our solutions from industry heavyweights such as Forrester, which recognized us as a 'Leader' in its Marketing Measurement and Optimization Solutions Wave report[.]

*The Preclusive Merger Agreement*

37.     The Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

38.     Despite a limited and inadequate "go shop" period, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 5.2(b) of the Merger Agreement states, in relevant part:

> (b) No Shop Period. Except with respect to any Excluded Person (but only for so long as such Person is an Excluded Person) until the Cut-off Date, on the No-Shop Period Start Date, the Company and its Subsidiaries and its and their respective directors, officers and employees shall, and the Company shall cause its and its Subsidiaries' other Representatives to (i) immediately cease all discussions and negotiations with respect to any Acquisition Proposal with any Person, including by terminating access to any physical or electronic data rooms relating to a possible Acquisition Proposal and requesting that any such Person and its Representatives promptly return or destroy all confidential information concerning the Company and its Subsidiaries theretofore furnished thereto by or on behalf of the Company or any of its Subsidiaries, and destroy all analyses and other materials prepared by or on behalf of such Person that contain, reflect or analyze such information, in each case in accordance with the applicable confidentiality agreement between the Company and such Person, and (ii) thereafter not (A) initiate, solicit or knowingly encourage any inquiry or the making of any proposal or offer that could constitute an Acquisition Proposal, (B) engage in, enter into, continue or otherwise participate in any discussion or negotiation regarding, or provide any non-public information concerning the Company or its Subsidiaries to any Person with respect to, any Acquisition Proposal, (C) grant any waiver, amendment or release under any standstill provision of any confidentiality or similar agreement to which the Company or any of its Subsidiaries is a party (unless the Company Board or any committee thereof determines in good faith, after consultation with its outside legal counsel, that the failure to do so would be inconsistent with its fiduciary duties under applicable Law), (D) waive the applicability of all or any portion of any anti-takeover Laws in respect of any Person (other than Parent and its Affiliates), or (E) otherwise cooperate with, knowingly assist, participate in or knowingly facilitate any effort or attempt to make any Acquisition Proposal.

39.    Further, the Company must advise Golden Gate, within one business day, of any proposals or inquiries received from other parties.  Section 5.2(d) of the Merger Agreement states:

> (d) Notice to Parent. No later than the No-Shop Period Start Date, the Company shall notify Parent of the number and identity of each of the Excluded Persons and provide Parent with a written summary of the material terms and conditions of any Acquisition Proposal received from any Excluded Person and any related material documents submitted by such Person on the basis of which the Company Board made the determination that such Person shall be an Excluded Person. From and after the No-Shop Period Start Date, the Company shall promptly (and in any event within one (1) Business Day) notify Parent if any proposals or offers are received by, any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, it or any of its Representatives with respect to any Acquisition Proposal, along with the material terms and conditions of any such proposals or offers (including, if applicable, copies of any such proposals or offers). The Company shall keep Parent informed in all material respects on a timely basis of the status and details of any such proposal, offer, request, discussion or negotiation.

40.    Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Golden Gate a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 5.2(c) of the Merger Agreement provides, in relevant part:

> Notwithstanding the foregoing or anything else to the contrary in this Agreement (including Section 5.3 and Section 5.5), at any time prior to obtaining the Company Stockholder Approval, the Company Board or any committee thereof may, if it determines in good faith (after consultation with its financial advisor and outside legal counsel) that failure to do so would be inconsistent with its fiduciary duties under applicable Law: (i) make any Adverse Recommendation Change in response to either a Superior Proposal or an Intervening Event or (ii) solely in response to a Superior Proposal, cause the Company to terminate this Agreement in accordance with Section 7.1(c)(ii) and substantially concurrently enter into an Alternative Acquisition Agreement with respect to such Superior Proposal; provided, however, that the Company may not make an Adverse Recommendation Change in response to a Superior Proposal or terminate this Agreement in response to a Superior Proposal unless:

(i) the Company notifies Parent in writing at least four Business Days before taking that action (the "Notice Period") that the Company Board has (A) received a bona fide Acquisition Proposal that has not been withdrawn, (B) concluded in good faith (after consultation with its financial advisor and outside legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and (C) resolved to effect an Adverse Recommendation Change or to terminate this Agreement in accordance with Section 7.1(c)(ii) absent any revision to the terms and conditions of this Agreement, which notice will describe the basis for such Adverse Recommendation Change or termination in reasonable detail and will include the terms and conditions of such Superior Proposal, the identity of the party making the Superior Proposal and copies of all material documents relating to such Acquisition Proposal (it being agreed that any amendment to the financial terms or any other material term of such Superior Proposal shall require a new written notice by the Company; provided that the Notice Period with respect to such new written notice shall be two Business Days); and

(ii) if Parent makes a proposal during the Notice Period to adjust the terms and conditions of this Agreement, the Company Board, after taking into consideration the adjusted terms and conditions of this Agreement as proposed by Parent, continues to determine in good faith (after consultation with its financial advisor and outside legal counsel) that such Superior Proposal continues to be a Superior Proposal and that the failure to make an Adverse Recommendation Change or terminate this Agreement, as applicable, would be inconsistent with its fiduciary duties under applicable Law; . . .

During the applicable notice period prior to its effecting an Adverse Recommendation Change or terminating this Agreement as referred to above, the Company shall, and shall cause its Representatives to, negotiate with Parent in good faith (to the extent Parent seeks to negotiate) regarding any revisions to the terms of the transactions contemplated by this Agreement proposed by Parent.

41.     Further locking up control of the Company in favor of Golden Gate, the Merger Agreement provides for a "termination fee" of up to $120 million, payable by the Company to Golden Gate if the Individual Defendants cause the Company to terminate the Merger Agreement.

42.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

***Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

43.     The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

44.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

45.     The financial analyses performed by the Company's own financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), confirm the inadequacy of the merger consideration. For example, J.P. Morgan's *Discounted Cash Flow Analysis* yielded an implied value per share of Neustar common stock as high as $37.50.   Additionally, J.P. Morgan's *Selected Publicly Traded Companies Analysis* yielded an implied value per share of Neustar common stock as high as $37.00.

46.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

47.     Meanwhile, certain of the Company's officers and directors stand to receive substantial benefits as a result of the Proposed Transaction.

48.     For example, it appears that members of Neustar's management team will retain their positions post-close.

49.     In the press release announcing the Proposed Transaction, Rishi Chandra ("Chandra"), a Managing Director at Golden Gate Capital, stated that "We look forward to partnering with the Neustar team to achieve its strategic objectives[.]"

50.     Additionally, in a December 14, 2016 email to employees, Individual Defendant Hook commented:   "Golden Gate Capital (GGC) and GIC have a successful ten-year track

record of working together and are like-minded in how they partner with management teams to grow their portfolio companies."

51.    Additionally, Individual Defendant Hook stands to receive $19,655,970 in connection with the Proposed Transaction, and the Company's other named executive officers stand to receive $24,135,039.

**The Proxy Statement Omits Material Information, Rendering It False and Misleading**

52.    Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

53.    The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

54.    First, the Proxy Statement omits material information regarding Neustar's financial projections and the financial analyses performed by J.P. Morgan in support of its so-called fairness opinion.

55.    For example, with respect to the Company's financial projections, the Proxy Statement fails to disclose: (i) net income; (ii) interest; (iii) taxes; (iv) depreciation and amortization; (v) stock-based compensation; (vi) restructuring costs for all years; (vii) standalone costs for all years; (viii) capital expenditures; (ix) changes in working capital; and (x) a reconciliation of GAAP to non-GAAP metrics.

56.    With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:  (i) the range of terminal values for the Company at the end of fiscal year 2025; (ii) the unlevered free cash flows, methodology, inputs, and calculated range of terminal values for the information services businesses of the Company ("ISXCo") and the Number Portability Administration Center (both U.S. and Canada), order management solutions,

and local number portability businesses of the Company ("OSSCo"); (iii) the expected unlevered free cash flows under the regional contracts between Neustar and North American Portability Management LLC under which Neustar provides Local Number Portability Administrator services in the United States (collectively, the "NPAC Contract"); (iv) J.P. Morgan's basis for applying perpetual revenue growth rates ranging from 1.5% to 2.5%; and (v) the inputs and assumptions underlying the weighted average cost of capital analysis of the Company in respect of ISXCo, OSSCo (excluding the NPAC Contract), and the NPAC Contract.

57.     With respect to J.P. Morgan's *Selected Publicly Traded Companies Analysis*, the Proxy Statement fails to disclose the individual multiples for the companies observed by J.P. Morgan in its analysis, as well as benchmarking statistics used by J.P Morgan, including growth rates, cash flow metrics, scale and competitive positioning, and multiples of the companies published by equity research analysts, and a listing of which companies were included in each of the five groupings utilized by J.P. Morgan.

58.     With respect to J.P. Morgan's *Precedent Transaction Multiples Analysis*, the Proxy Statement fails to disclose the individual multiples for the transactions observed by J.P. Morgan in its analysis, as well as benchmarking statistics used by J.P Morgan, including growth rates, cash flow metrics, scale and competitive positioning, and multiples of the companies published by equity research analysts, and a listing of which transactions were included in each of the groupings utilized by J.P. Morgan.

59.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.   Moreover, when a banker's endorsement of the

fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

60.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Reasons for the Merger"; (iii) "Recommendation of the Company's Board of Directors"; (iv) "Opinion of the Company's Financial Advisor"; and (v) "Projected Financial Information."

61.     Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

62.     In the press release announcing the Proposed Transaction, Chandra, Managing Director at Golden Gate Capital, stated that "We look forward to partnering with the Neustar team to achieve its strategic objectives[.]"  Additionally, Individual Defendant Hook's December 14, 2016 email to Company employees stated:   "Golden Gate Capital (GGC) and GIC have a successful ten-year track record of working together and are like-minded in how they partner with management teams to grow their portfolio companies."

63.     However, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Neustar's officers and directors, including who participated in all such communications.

64.     Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that

information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

65.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Reasons for the Merger"; (iii) "Recommendation of the Company's Board of Directors"; and (iv) "Interests of the Company's Directors and Executive Officers in the Merger."

66.     Third, the Proxy Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

67.     For example, the Proxy Statement fails to disclose the nature of the "prior discussions with Party A regarding [the C]ompany in early 2016."

68.     Similarly, the Proxy Statement fails to disclose the nature of the "prior discussions with Party C [and Party D] regarding a potential investment in [the C]ompany in 2015."

69.     The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement:  (i) "Background of the Merger"; (ii) "Reasons for the Merger"; and (iii) "Recommendation of the Company's Board of Directors."

70.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Neustar's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated
Thereunder Against the Individual Defendants and Neustar**

71.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72.     The Individual Defendants disseminated the false and misleading Proxy
Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and
Rule 14a-9, in light of the circumstances under which they were made, omitted to state material
facts necessary to make the statements therein not materially false or misleading.  Neustar is
liable as the issuer of these statements.

73.     The Proxy Statement was prepared, reviewed, and/or disseminated by the
Individual Defendants.  By virtue of their positions within the Company, the Individual
Defendants were aware of this information and their duty to disclose this information in the
Proxy Statement.

74.     The Individual Defendants were at least negligent in filing the Proxy Statement
with these materially false and misleading statements.

75.     The omissions and false and misleading statements in the Proxy Statement are
material in that a reasonable stockholder will consider them important in deciding how to vote on
the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate
disclosure as significantly altering the total mix of information made available in the Proxy
Statement and in other information reasonably available to stockholders.

76.     The Proxy Statement is an essential link in causing plaintiff and the Company's
stockholders to approve the Proposed Transaction.

77.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and
Rule 14a-9 promulgated thereunder.

78.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Golden Gate

79.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

80.     The Individual Defendants and Golden Gate acted as controlling persons of Neustar within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Neustar and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

81.     Each of the Individual Defendants and Golden Gate was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

82.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy Statement.

83.     Golden Gate also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

84.     By virtue of the foregoing, the Individual Defendants and Golden Gate violated Section 20(a) of the 1934 Act.

85.     As set forth above, the Individual Defendants and Golden Gate had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for

plaintiff's attorneys' and experts' fees; and

      F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: January 20, 2017               **RIGRODSKY & LONG, P.A.**

                             By:   */s/ Brian D. Long*

**OF COUNSEL:**                     Brian D. Long (#4347)

                                   Gina M. Serra (#5387)

**RM LAW, P.C.**                     2 Righter Parkway, Suite 120

Richard A. Maniskas               Wilmington, DE 19803

995 Old Eagle School Road, Suite 311     (302) 295-5310

Wayne, PA 19087

(484) 588-5516                     *Attorneys for Plaintiff*